IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-2779

EXTRACTION OIL & GAS, INC.

Plaintiff,

v.

THE CITY AND COUNTY OF BROOMFIELD, including the Broomfield City Council, and all other governmental officers, persons and entities who act on behalf of the City and County of Broomfield;

Defendants.

---

## VERIFIED COMPLAINT

---

## I.   INTRODUCTION

1.      Plaintiff Extraction Oil & Gas, Inc. ("Extraction") operates six multi-well oil and gas well sites in Broomfield, pursuant to a contract with the City and County of Broomfield – the 2017 Operator Agreement.  To date, Extraction has invested over one hundred million dollars in its Broomfield Project.  Extraction's contract and property rights are vested and may not be retroactively impaired by Broomfield.

2.      Many Broomfield residents oppose all oil and gas development, and want to shut down Extraction's operations.  In response to these shutdown demands, Defendant Broomfield is using its regulatory and police powers in bad faith to illegally and unconstitutionally shut down Extraction's operations.  Broomfield's current shut-down tactic is a municipal noise ordinance that Broomfield enacted specially for Extraction, which applies only to Extraction, which Broomfield has enforced only against Extraction, and is which designed to be impossible to comply with.  The Broomfield Municipal Court

has refused to consider Extraction's legal and constitutional defenses to this prosecution, ruling that such matters are for a different court.  Hence this lawsuit.

In this action, Extraction seeks:

- damages for Broomfield's breaches of Extraction's 2017 Operator Agreement with Broomfield, and related constitutional torts;

- declaratory judgments regarding its rights under the 2017 Operator Agreement and Broomfield's obligations under that contract;

- equitable relief including an injunction enjoining Broomfield from using its police or regulatory powers in bad faith (*e.g.* in a manner that is in any way illegal or unconstitutional) to shut down Extraction's operations or otherwise impair its vested rights; and

- a determination that if Broomfield can use its police and regulatory powers to shut down or impair Extraction's operations, then such action constitutes a regulatory taking for which Broomfield must pay just compensation, as determined in this action; and enjoining Broomfield from shutting down any Well Site until it has deposited a just compensation bond with the Court equal to the value of the oil and gas development rights it will take through its proposed shutdown.

## II.    PARTIES, JURISDICTION AND VENUE

3.    Plaintiff Extraction is a Delaware corporation with its principal place of business in Denver, Colorado.  Extraction is authorized to conduct business in Colorado by the Colorado Secretary of State.

4.    Defendant the City and County of Broomfield ("Broomfield" or the "City") is a home-rule municipality of the State of Colorado.

5.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1343 based on 42 U.S.C. § 1983 and questions of federal constitutional law.  Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.  This Court exercises supplemental jurisdiction over Extraction's state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is appropriate in this Court because the action concerns real property in Broomfield, Colorado, Extraction conducts business in Colorado, and all actions occurred in Colorado.

### III.      FACTUAL BACKGROUND

7.      Because this complaint seeks extraordinary equitable relief, Extraction provides a commensurately detailed and thorough explanation of the facts to justify why such relief is warranted.  Extraction develops the history of its dealings with Broomfield regarding the 2017 Operator Agreement in full detail in order to establish how Broomfield's repeated efforts to shut down the Project are not legitimate exercises of its police and regulatory powers, but illegal and bad faith attempts to shut Extraction down and drive it out of town by any means necessary.

**A.      Extraction's Project and its constituent agreements**

        **a.  Predecessor agreements**

8.      Extraction is the successor-in-interest to two prior agreements and associated use by special review permits approved by Broomfield.

9.      First, Extraction is the successor-in-interest to the August 27, 2013 Oil and Gas Operator Agreement between Sovereign Operating Company and Broomfield (the "Sovereign Operator Agreement"), which allowed Sovereign to drill and develop oil and gas wells from ten well pad sites in the City.

10.     In 2014, in response to Broomfield's attempt to enact a moratorium on hydraulic fracturing, the Broomfield District Court adjudicated Sovereign's rights under the Sovereign Operator Agreement.  The court held that Sovereign's mineral development rights were vested contract and property rights that Broomfield could not impair through a later-enacted hydraulic fracturing moratorium.  *See* 9/25/2014 order in *Sovereign*

*Operating Co. LLC v. City and County of Broomfield*, Case No. 14 CV 30092. **Exhibit 1**.

11.    The Broomfield District Court specifically discussed how Sovereign's investment of resources in its Broomfield project (which is now Extraction's Project), in justifiable reliance on its bargained-for contract rights with the City, prevented the City from impairing these rights through later legislation. *Id.* at 11-12.

12.    The Court so held despite the "Future Regulations" provision of the Sovereign Operator Agreement (which is nearly identical to the parallel Future Regulations provision in Extraction's 2017 Operator Agreement), which allowed Broomfield to enact more stringent regulations, so long as the regulations applied generally to all oil and gas activities. *Id.* at 5.

13.    Broomfield did not appeal this judgment.

14.    The Broomfield District Court's judgment applies to Extraction's current 2017 Operator Agreement with Broomfield through principles of issue preclusion. *Foster v. Plock*, 2017 CO 39, ¶ 13, 394 P.3d 1119, 1123.

15.    The second prior agreement is the November 13, 2012 Noble Energy, Inc. Surface Use Agreement ("Noble Agreement"), which provided rights to develop two well pad sites. The Noble Agreement governed what is now the current Livingston Well Site, which (under the current 2017 Operator Agreement) is subject to numerous best management practices ("BMPs") involving every aspect of operations in order to minimize its impact on nearby residents. Under the Noble Agreement, only minimal BMPs were required.

16.    In combination, the Sovereign Operator Agreement and the Noble Agreement authorized 12 well sites from which Extraction could drill as many horizontal wells as a COGCC spacing order permitted.

-4-

**b. Extraction and Broomfield amend and restate the Sovereign and Noble Agreements in the 2017 Amended and Restated Operator Agreement and the related Settlement and Surface Use Agreements.**

17. Until 2019, local government attempts to ban or regulate oil and gas development were largely preempted by Colorado state law. *See*, *e.g.*, *Longmont v. COGCC*, 369 P.3d 573, 585-86 (Colo. 2016) (local bans on hydraulic fracturing were operationally preempted by state law, despite citizens' rights under the Colorado Constitution to secure their safety and happiness).

18. Broomfield's Municipal Code in 2015 did not purport to ban oil and gas development, but provided two avenues for developing oil and gas: through a Use by Special Review (USR) process (the traditional permitting process); or through a contract between the operator and the City (called a memorandum of understanding or operator agreement) that covers the requirements of USR permitting, and allows the parties to further tailor the project as they see fit. *See* Broomfield Municipal Code (BMC) §§ 17-54-050 *et seq*. (USR) and 17-54-200 (operator agreement); *see also* § 17-54-280 (discussing enforcement for "special review permits, memorandums of understandings or operator agreements").

19. After acquiring the Sovereign and Noble interests, Extraction could have developed those interests according the terms of the Sovereign Operator Agreement and Noble SUA. These agreements had already been approved by Broomfield through these code processes; the Broomfield District Court had adjudicated Sovereign's rights as vested; and while the Noble rights had not been similarly adjudicated, the same analysis applied to them.

20. Instead of proceeding to develop its vested rights under the existing

agreements, Extraction agreed to work with Broomfield to accommodate concerns of Broomfield residents by redesigning its Broomfield development plans to consolidate well sites, minimize the footprint and maximize protections for Broomfield residents (the "Project").

21.     Starting in 2015, the revised Broomfield Project underwent years of review, revision, debate, public comment and negotiations.  Broomfield held a town hall meeting at the 1STBANK Center  about the Project, and appointed a special Oil and Gas Task Force that issued a series of recommendations that were ultimately incorporated into the 2017 Operator Agreement.

22.     As Broomfield knew during these negotiations and public engagements, Extraction cannot shut down its operations at night, but must drill, complete, equip and operate its Well Sites continuously (24/7) in order to develop its assets in an economically viable manner.  Extraction's night operations were discussed with the Broomfield Task Force in negotiating the Operator Agreement; they were discussed in Extraction's planned operational schedules; and they are reflected in other aspects of the negotiated Operator Agreement like the prohibition on unloading pipe at night (which only makes sense if there are night operations otherwise taking place).

23.     Throughout these years of public engagement, Broomfield never sought to impose a noise limit for Extraction's night operations that would be impossible to comply with, like the 40 dBA limit in the 2020 Noise Ordinance that Broomfield recently enacted to shut down Extraction's operations (discussed below).

24.     Had Broomfield demanded an impossible-to-comply-with night noise limit, Extraction would have terminated negotiations and developed its assets per the terms of the existing Sovereign and Noble agreements and the default state-wide noise mitigation

-6-

regime imposed by the Colorado Oil and Gas Conservation Commission ("COGCC"): Rule 802, which imposes a night noise limit of 75 dBA during the construction, drilling and completion phases. *See* https://cogcc.state.co.us/documents/reg/Rules/LATEST/800Series.pdf

25.     After going through the Task Force process, undertaking noise studies with third-party noise consultants, Broomfield did not insist on a 40 dBA or other impossible night noise limit.  Rather, Broomfield agreed to a noise mitigation regime that limited Extraction's operational noise to "4 dBA higher than baseline ambient sound" measured at 1,000 feet from the sound walls at a Well Site, for both day and night operations.  *See* **Exhibit 2**, 2017 Amended and Restated Oil and Gas Operator Agreement ("Operator Agreement") at PDF pages 38-39, BMP 31.  That was a noise limit that Extraction, with the implementation of specialized equipment and associated extra cost, could nevertheless work with.

26.     Broomfield also required many other noise mitigation measures (like sound walls, special restrictions on non-essential traffic during the morning and afternoon rush hours, use of pipelines instead of trucks to transport oil from the well sites) which, along with the other BMPs, required significantly more investment than would have been required to develop under the terms of the prior Sovereign and Noble agreements.  This significant reliance on Broomfield's express agreements, including the BMP 31 noise limit of ambient + 4 dBA, made Extraction's already-vested property and contract rights independently vested under controlling Colorado law.

27.     Based on all of these express understandings and agreements, in October 2017 the Broomfield City Council formally voted to approve the 2017 Amended and Restated Oil and Gas Operator Agreement, and related Surface Use Agreement and

-7-

Settlement Agreement.  **Exhibit 2** (with irrelevant attachments and exhibits omitted).

Because these three Agreements were enacted together and reference each other, they are

properly construed together.  Extraction will refer to the three Agreements collectively as

the 2017 Operator Agreement, unless circumstances require differentiation.

28.     The inter-related 2017 Operator Agreement, Surface Use Agreement and

Settlement Agreement contain a jury waiver as noted in Exhibit 2, Surface Use Agreement

¶ 6:

> Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado.  The Parties waive the right to trial by jury with respect of any action, suit or proceeding arising out of or relating to this Agreement or any contemplated transaction.

29.     Extraction paid Broomfield over $4.4 million in cash and conveyance of

land for property rights and other accommodations required by the 2017 Operator

Agreement, which Extraction would not have been required to pay had it developed under

the approved and vested Sovereign and Noble Agreements.

30.     The 2017 Operator Agreement begins by re-affirming the vested nature of

Extraction's rights:

> WHEREAS, the Parties agree that Operator's rights and duties set out in the Operator Agreement, as Supplemented have been and **remain vested** as determined by the Court in *Sovereign Operating Co. LLC v. City and County of Broomfield*, Case No. 2014CV30092 and that the Operator Agreement, as Supplemented remains in full force and effect; ...

> WHEREAS, the Parties agree that the Parties each have rights and duties set forth in the [prior Noble agreement], **which are also fully vested and may not altered or diminished without express agreement between the Parties**;

> WHEREAS, the City and Operator value a balanced approach to oil and gas development that is protective of public health, safety, and welfare, including the environment and wildlife resources.  To that end, **in order to achieve those goals in a cooperative manner,** the City and the Operator enter into this Agreement pursuant to Chapter 1-54 of the

> Broomfield Municipal Code ("BMC") allowing for this Agreement to adopt the best management practices set forth in Exhibit B (hereinafter referred to as "BMPs") for Operator's oil and gas operations at the Well Sites set forth on Exhibit A;

**Exhibit 2**, 2017 Operator Agreement at 1-2 (emphases added).

31.    The 2017 Operator Agreement takes the 12 well sites with about 200 wells contemplated by the prior Sovereign and Noble Agreements, and reduces them to six well sites with 84 wells.  The 2017 Operator Agreement thus reduced the footprint of oil and gas development in Broomfield by half, both in terms of wells and Well Sites.

32.    The locations of the six Well Sites were determined in full consultation with the City after conducting an extensive alternative site analysis utilizing criteria on setback distances and other items recommended by the City's oil and gas Task Force composed of Broomfield citizens.

33.    The 2017 Operator Agreement also includes 57 categories of BMPs, many with numerous subparts, for New Wells at Well Sites.  These BMPs meet or exceed all federal, state and local standards.  The 2017 Operator Agreement also conforms to the Broomfield Municipal Code and incorporated the Task Force's recommendations.

34.    The 2017 Operator Agreement has numerous provisions and BMPs addressing noise.  For example the 2017 Operator Agreement requires Extraction to use grid-based electric power instead commonly-used diesel-generated power for operations; it prohibits unloading of pipe at night (an acknowledgement that Extraction would be operating at night); and it requires Extraction to use quieter and cleaner Tier 2 engines to operate pumps and the use of Tier 4 engines if those were to become commonly available.

35.    Most importantly, the 2017 Operator Agreement's BMP 31 on Noise Mitigation incorporates the existing COGCC noise regulation Rule 802, but imposes a

lower noise limit of "4 dB(A) higher than baseline ambient sound measured at 1,000 feet from the sound walls at the Well Site." **Exhibit 2** at BMP pages 16-17.

36.     Per COGCC Rule 802(c)(5), which is incorporated into BMP 31, this ambient +4 dBA noise limit is the limit for Extraction's operational noise.  It is not the limit for all noise (both Extraction's and ambient).  Extraction cannot control ambient noise levels from sources like traffic, plane overflights, geese, etc.

37.     Per the 2017 Operator Agreement and its detailed Comprehensive Drilling Plan (a 3,000+ page document approved by Broomfield after several iterations of comment and revision), the parties undertook another noise study (by a noise expert pre-approved by Broomfield) to establish ambient noise levels at the Well Sites for determining the operational noise limit under BMP 31.

38.     Per the Operator Agreement and the related Surface Use Agreement, Extraction's six Well Sites were located in and along a corridor of Broomfield municipal open space surrounding the Northwest Parkway between Interstate 25 on the east and the Sheridan Parkway on the west.  *See* Broomfield website maps at https://www.broomfield.org/DocumentCenter/View/29209/Extraction-Well-Distance.  Extraction purchased some of this land to accommodate the City's demands to move from some of the sites included in the prior Sovereign and Noble agreements.

39.     The Livingston Well Site had the highest ambient noise levels of the six Well Sites because of its location at the intersection of three busy thoroughfares: the Northwest Parkway, Sheridan Parkway, and Lowell Boulevard.  The average ambient noise at this location was 61 dBA – before Extraction's operations.  Broomfield thus expressly agreed to allow Extraction to operate at 65 dBA – both day and night – at this location.  **Exhibit 3** (excerpt from noise study in CDP).

40.     While this agreed-upon 65 dBA noise limit is the loudest of the six Well Sites, it is still 10 to 15 dBA quieter than the otherwise-applicable 80 dBA day and 75 dBA night noise limits that would have applied under COGCC Rule 802 – a good result for Broomfield residents.

**B.      Broomfield voters enact Charter Amendment 301.**

41.     Some Broomfield residents categorically oppose all oil and gas development, and therefore did not view the City's enormous gains from the Operator Agreement as a sufficient win.

42.     In November 2017, about two weeks after Broomfield approved the 2017 Operator Agreement, Broomfield voters passed ballot measure 301 (the "Charter Amendment"), which amended the Broomfield City Charter to direct that Broomfield exercise its powers of local self-governance and home rule to "condition oil and gas development permits to require oil and gas development to only occur in a manner that does not adversely impact the health, safety, and welfare of Broomfield's residents in their workplaces...."

43.     The Charter Amendment does not purport to repudiate the 2017 Operator Agreement.

44.     The Charter Amendment does not purport to operate retroactively to impair contracts that the City entered into before its enactment.

45.     In any event, the Charter Amendment or similar subsequent acts by Broomfield's government or residents cannot operate retroactively per C.R.S. § 31-2-217 and settled principles of law regarding retroactivity.  *See* **Exhibit 1**, 9/25/2014 order in *Sovereign v. Broomfield*, citing and discussing *City of Golden v. Parker*, 138 P.3d 285, 290 (Colo. 2006) and related cases; *Taylor Morrison of Colorado, Inc. v. Bemas Constr.*

-11-

*Inc.*, 2014 COA 10, ¶ 17.

46.     Retroactive application aside, the Charter Amendment provides no concrete rules or regulations for oil and gas development.  It only directs Broomfield's government to condition future "oil and gas development <u>permits</u>" on the absence of adverse impact on Broomfield residents' health, safety and welfare (emphasis added).  Extraction's Project is authorized by the 2017 Operator Agreement – a contract – not a USR permit.

47.     The 2017 Operator Agreement comports with the Charter Amendment.  It protects the health, safety and welfare of Broomfield residents by reducing the footprint of the Project by half, and adding numerous BMPs and technological advances to protect the health, safety, and welfare of Broomfield's residents.

48.     Per the 2017 Operator Agreement and approved CDP, Extraction mobilized and began drilling and completions operations.   To date, Extraction has spent approximately $150 million on drilling and completion operations and has entered burdensome contractual commitments in order to cause the construction of an approximate  $240 million pipeline system and central gathering facility so oil and gas from the wells can be produced into a closed-loop system without permanent tanks and processed miles away from Broomfield in rural Weld County, minimizing the Project's footprint, environmental impact, and noise.

**C.     Lawsuits by environmental activists have failed to halt the Project.**

49.     As noted, while the Project was approved in a lengthy and open political process, it has always faced opposition from some Broomfield residents and others who categorically oppose oil and gas development, or oppose oil and gas development in or near residential areas.

50.     Residents of Broomfield and other self-appointed activists have attempted

to shut down the Project through several lawsuits, none of which has succeeded. *See The Broomfield Way et al v. Broomfield and Extraction*, no. 2017CV30213 (claims against Extraction dismissed, and claims against Broomfield settled); *Wildgrass Oil and Gas Committee v. COGCC*, no. 2018CV32513 (dismissed, now on appeal); *WildEarth Guardians et al v. Broomfield and Extraction*, no. 2018CV30316 (dismissed, now on appeal); *Wildgrass Oil and Gas Committee v. COGCC*, U.S. District Court no. 19-cv-00190-RBJ (dismissed by Judge Jackson).

51.     There is also other pending litigation involving the Broomfield Project and all involving overlapping plaintiffs and counsel, demonstrating the level of organized opposition to Extraction's Broomfield Project. *See Wildgrass Oil and Gas Committee v. COGCC*, 2019CV33888 and *Elise Ter Harr, et al. v. COGCC and Extraction Oil & Gas, Inc.*, 2019CV34485.[1]

52.     These lawsuits by organizations of Broomfield residents evidence the determination of these residents to shut down Extraction's operations in Broomfield.

53.     These same residents elect Broomfield's City Council (which also operates as Broomfield's Board of Health), and can thereby direct Broomfield government to use the full extent of its power to shut down the Project.

---

[1] Counsel for *The Broomfield Way et al* in no. 2017CV30213 was Kate Merlin; Counsel for *Wildgrass Oil and Gas Committee* in no. 2018CV32513 was Annie Marie Byers and Kate Merlin; Counsel for *WildEarth Guardians et al* in no. 2018CV30316 was Kate Merlin and Dan Leftwich; Counsel in *Wildgrass Oil and Gas Committee* in no. 19-cv-00190-RBJ was Joe Salazar and Dan Leftwich (Ann Marie Byers was their sole witness at the hearing); Counsel for *Wildgrass Oil and Gas Committee* in no. 2019CV03388 was Joe Salazar and Kate Merlin; Elise Ter Haar is represented by Joe Salazar.  The Wildgrass Oil and Gas Committee is led by Broomfield Councilmembers Jean Lim and Laurie Anderson, both of whom are leaders of Broomfield Concerned.

**D.     SB 19-181**

54.     Broomfield's power to regulate oil and gas development changed in April 2019, when Governor Polis signed SB 19-181 into law.  SB 19-181 generally gives cities and counties like Broomfield greater local control over oil and gas development.

55.     SB 19-181 does not apply retroactively.  Specifically, section 19 of SB 19-181 states: "This act applies to conduct occurring on or after the effective date of this act, including determinations of applications pending on the effective date."

56.     The 2017 Operator Agreement and CDP were both approved and adopted by Broomfield well before the effective date of SB 19-181.  The 2017 Operator Agreement (which is a contract) and its associated CDP contain the comprehensive regulations governing the Project.  While Extraction's operations began before and will continue after the effective date of SB 19-181, the agreed-upon conditions for those operations were set before SB 19-181 became effective.

57.     While Broomfield might thus apply its new regulatory authority from SB 19-181 to *future* oil and gas development, SB 19-181 does not empower or permit Broomfield to unilaterally change the terms of the 2017 Operator Agreement or the CDP, or otherwise nullify Extraction's vested contract and property rights.  *See* Colo. Const. art II § 11 (impairment of contracts); *City of Golden v. Parker*, 138 P.3d 285 (Colo. 2006); U.S. Const. Art. Article I, section 10; **Exhibit 1**, 9/25/2014 order in *Sovereign v. Broomfield*. Nor does SB 19-181 authorize Broomfield to perform its obligations under the 2017 Operator Agreement in bad faith, with the goal of thwarting Extraction's reasonable expectations under the contract.

**E.    Broomfield announces its intention to "penetrate" the 2017 Operator Agreement and shut down the Project.**

58.    Broomfield residents who oppose oil and gas development (and do not understand or care about vested rights, the Contract Clause, regulatory takings, etc.), believed that SB 19-181 finally gave Broomfield the authority it needed to shut down Extraction's operations.

59.    Despite knowing that Extraction's contract and property rights are vested, and that Extraction has invested millions of dollars in its Project in reliance on these vested rights, Broomfield has publicly announced its intent to use its new powers under SB 19-181 and Charter Amendment 301 to shut down Extraction's Project – apparently without regard to the extraordinary financial consequences.

60.    In August 2019, Broomfield's long-time City Manager Charles Ozaki retired. He was replaced by Jennifer Hoffman.

61.    Ms. Hoffman, and other Broomfield government officials, have repeatedly stated that the City seeks to use the powers they believe have been conferred by the Charter Amendment and SB 19-181 to "penetrate" the 2017 Operator Agreement, *i.e.* to find some basis for declaring Extraction in breach, or otherwise use the City's police and regulatory powers to shut down the Project.

62.    The City plainly and forthrightly declared this intent at a September 30, 2019, Broomfield "Community Meeting on Methane and Soil Gas Testing Information." https://www.broomfield.org/CivicAlerts.aspx?AID=1645.  Video of this meeting is also posted on Broomfield's website, at https://drive.google.com/file/d/1Mcuf2u31dfe2fwypYakRxerV9H_wU-HC/view.

63.    At this meeting, Ms. Hoffman responded to Broomfield residents' concerns

about Extraction's Project in the following language (at 1:03:18):

> So from the Operator's Agreement, and again you're not going to agree with what I'm going to say, and I'm okay with that.  The Operator Agreement has been in place; it is all encompassing.  So until there is a point, and again it allows us a different conversation with [Charter Amendment] 301 married to [SB 19-] 181.  It is a different playing field than we had before.  **We are working hard to penetrate our existing rules and regs by incorporating [SB 19-] 181 and having that be paramount.  There is questions about how much [SB 19-] 181 can penetrate an existing oil and gas Operator's Agreement.**  So it's not a swift, easy answer to be able to say we're hesitant, we're going to shut it down.  We're not there.  I can't speak to what was in the Operator's Agreement.  I can speak to the folks that put that together, in my opinion, did the very best that they could do with the knowledge that they had at the time.  (emphasis added)

Moments later, in response to a resident's fervent call for the City to immediately shut down Extraction's Project (at 1:05:55), Ms. Hoffman states at 1:06:22:

> They [Extraction] are not in breach.  So . . .  If I had an answer I would provide the answer.  I don't have the answer.  I don't have the answers.  **I can tell you that we are working diligently.  Every day we're focused on this.  I've been on the job eight weeks, and from the perspective of trying to figure out where the Operator's Agreement is, how we are penetrating that Operator's Agreement with [Charter Amendment] 301 and [SB 19-] 181 is a daily task.  It consumes all of my time, my energy and my effort.  From the breach perspective, will we get there? I don't know.**  (emphases added)

64.    **This is an extraordinary admission.**  City Manager Hoffman publicly announced and explained to Broomfield residents who categorically oppose the Project that, as of September 2019, the City did not <u>yet</u> feel that it had found an adequate basis for declaring Extraction in breach of the 2017 Operator Agreement and shutting down the Project; but the City's current and all-consuming task was to do precisely this: find some basis for declaring Extraction to be in breach, and halt the Project.

65.    In November 2019, Broomfield elected a new City Council that more uniformly opposes oil and gas development in general, and Extraction's Project in

particular.  Any prior division or disagreement over oil and gas development (such as enabled Broomfield City Council to narrowly vote in favor of the 2017 Operator Agreement in 2017) has now given way to uniform opposition, coupled with an evident willingness to flout the law despite the implications.  As a result, Broomfield is now bringing all of its legislative and executive power to bear on its stated goal of shutting down Extraction's operations.

66.     Starting September 2019, Broomfield began trying out potential bases for alleging breach and shutting down Extraction.  For example:

- Broomfield asserted that Extraction must use irrigation ditch water for its cement, knowing that water with sediment cannot be safely used for making cement—the motive here was so that Extraction could not make its cement at all.

- Broomfield asserted that Extraction must use one particular (and unavailable) brand of drilling mud.

- Broomfield asserted that Extraction's hydraulic fracturing operations had to use Tier 4 engines for its pumps, which Extraction in fact has used whenever available. (The 2017 Operator Agreement only requires their use once they become "commonly available, but there is only one Tier 4 fleet available in the DJ Basin; yet Broomfield has insisted that Extraction must use the Tier 4 engines regardless of availability.)

- Broomfield sent Extraction a letter demanding that Extraction provide Material Safety Data Sheets within ten days and threatening criminal prosecution, when Extraction had already made the information available.

67.     None of these complaints had any merit, and Broomfield did not follow through with any lawsuits, prosecutions or other shutdown efforts based on them.  These were just initial skirmishes.  These initial shutdown strategy auditions nonetheless required extensive attention from Extraction's personnel and counsel to address, at considerable expense.

68.     Broomfield came much closer to shutting Extraction down through a novel and truly astonishing tactic prompted by the COVID-19 crisis.  In March 2020, the

Broomfield City Council, operating as the City's Board of Health, prepared an emergency public health order to shut down Extraction's imminent flowback operations at the Livingston Well Site under the theory that these operations could pollute the air, which could pose special dangers for COVID-19 sufferers.[2]

69.     Unfortunately for Broomfield, its *own experts* confirmed that Extraction's flowback operations were state-of-the-art and posed no danger to public health or safety; whereas leaving the recently-fracked wells pressurized actually could pose a genuine public safety threat. *See* audio of 3/25/2020 meeting, http://broomfield.granicus.com/MediaPlayer.php?view_id=6&clip_id=1571, at 32:00-36:39; 1:34:20.

70.     So the Broomfield City Council / Board of Health changed its rationale for the proposed public health order it had prepared: it decided that the proposed shutdown was now supposedly needed to alleviate a public health crisis of "stress and anxiety" that some Broomfield residents experience from the mere existence of oil and gas development in the City.

71.     To this end, Broomfield's Public Health Director testified that some Broomfield residents believe that oil and gas development is inherently dangerous and unhealthy, and it therefore causes them to experience anxiety and stress; and such anxiety and stress might cause adverse health outcomes in conjunction COVID-19. *See* audio at 3:27:30 - 3:30:00. The Public Health Director therefore recommended that Extraction's flowback operations be suspended as a public health hazard – not because they posed any

---

[2] Needless to say, Broomfield did not consider curbing any other sources of air emissions – just Extraction's operations.

actual health or safety risks, but because they "stress out" some Broomfield residents.  *See* audio of 3/25/2020 meeting at 3:58:48 - 4:02:30.  One member of the Broomfield City Council / Board of Health cheered at the recommendation.  *Id.* at 4:02:00.

72.     This reasoning is logically circular, and absurd.  Any county board of commissioners or city government could use this rationale to shut down any politically unpopular business, or justify any impairment of any city contract, *i.e.*: *we would abide by terms of our contract, but doing so stresses out our residents; so we must disregard the contract to protect public health.*  Again, needless to say, Broomfield residents do not suffer stress and anxiety over, *e.g.*, the City's contractual obligation to repay its municipal bonds.  The only contract that Broomfield decided had to be abrogated to prevent a public health emergency of stress and anxiety was its 2017 Operator Agreement with Extraction.

73.     Extraction sought and obtained a TRO from the Broomfield District Court to prevent being shut down by the proposed public health order, which Broomfield was scheduled to approve in a matter of days.  The Court later dissolved the TRO over ripeness concerns, because the Court believed it could not enjoin Broomfield until it actually enacted the public health order.  But in its order dissolving the TRO, the Court observed:

> **The court certainly is not unmindful that most, if not all, of Broomfield's City Council members will, perhaps, stop at nothing in their efforts to shut-down Extraction's oil and gas operations**, and in particular Extraction's scheduled flowback operations at its Livingston Well Site.  However, the court simply reminds Broomfield that when exercising its police powers, it may not do so in an in a manner that is contrary to constitutional rights or privileges or is arbitrary and capricious and not rationally related to combating the spread of COVID-19, lest it again face Extraction's request for temporary, preliminary, and/or permanent injunctive relief.

**Exhibit 4**, 4/6/2020 order in *Extraction v. Broomfield*, no. 2020CV30106 at 17 (emphasis added).

74.     Likely as a result of this carefully worded judicial warning, the Broomfield City Council / Board of Health tabled its proposed emergency public health order to shut down Extraction's operations; and Extraction (having successfully deflected that particular shutdown strategy) voluntarily dismissed the lawsuit.

**F.     Broomfield's current shutdown strategy: noise enforcement.**

75.     Broomfield's most concerted illegal shutdown effort is through a special noise ordinance which applies only to Extraction, and which Broomfield enacted to shut Extraction down.

76.     Opposition to Extraction's Project is well organized.  Websites such as Broomfield Concerned (which is run by a Broomfield City Council member) effectively tell opponents of Extraction's Project about the current strategy for shutting down the Project, and how they can participate in these shutdown efforts.  *See, e.g*., http://broomfieldconcerned.org/take-action/call-to-action-residents-urged-to-write-in-and-attend-tuesday-city-council-meeting/ (1/13/2020 "Call to Action" exhorting opponents of the Project to register noise complaints to support an emergency noise ordinance).  Broomfield's own municipal website alerts residents to Extraction's operations and encourages residents to register complaints with a click.  *See* https://www.broomfield.org/1820/Oil-and-Gas, with link to weekly "Look Ahead" newsletter advising Broomfield residents what they can expect to see, hear and smell at each   Well   Site,   with   links   to   register   complaints.   *E.g*. https://drive.google.com/file/d/147Vq3hCO3UjUyQ3SyWQTDHWJn2Ztm8r1/view. No surprise then, that when word spread that noise complaints provided the best likelihood of success for shutting down the Project, complaints began pouring in, some from many miles away from the actual well sites and some during periods where

Extraction had no ongoing activity.  Broomfield's noise complaints are thus highly suspect.

77.     To the extent that any noise complaints might be legitimate, they are a result of Broomfield's poor understanding of industrial acoustics, and in particular the fact that night noise *seems* louder than day noise.

78.     Because suburban acoustic environments become much quieter at night, existing noise sources sound comparatively louder at night even if they generate no more noise than during the day.  That is why some noise laws (like the COGCC's Rule 802, and C.R.S. § 25-12-103) impose separate daytime and lower nighttime noise limits.  BMP 31, by contrast, imposes a single noise limit of ambient +4 dBA, with no separate lower limit for night noise.

79.     The majority of noise complaints occurred in December 2019, ostensibly based on night noise at Extraction's Livingston Well Site, which is located near the intersection of three busy thoroughfares, and just across the Northwest Parkway from the Anthem residential subdivision.  *See* map at https://www.broomfield.org/DocumentCenter/View/29209/Extraction-Well-Distance. Extraction's operational noise remained the same as it was during the day: within the agreed-upon ambient plus 4 dBA limit of 65 dBA; but some Anthem residents may have complained because the operational noise suddenly *seemed* louder because everything else – including traffic – quieted way down at night.[3]

80.     It took Broomfield a while to figure out how the noise limit it had

_____

[3] It is impossible to know without extensive discovery, and it may never be possible to determine, whether particular noise complaints were sincere, or were just residents' contribution to the popular effort to shut down Extraction.

contractually agreed to actually worked: *e.g.* loud noise from routine highway traffic, airplanes, coyotes, etc. might generate a spike at a noise monitor near a Well Site, but that did not mean that *Extraction* had violated the agreed-upon noise limit.  As Broomfield developed a more sophisticated understanding of its agreed-upon noise regulation, and industrial acoustics generally, it realized that it should have negotiated for a noise mitigation regime with a separate lower night noise limit.

81.     Broomfield could have responded to residents' night noise complaints by explaining that Broomfield had negotiated well for them by obtaining the ambient +4 dBA noise limit in the Operator Agreement (hence 65 dBA at Livingston and even less at the other Well Sites), since the alternative would have been 75 dBA at night permitted by COGCC Rule 802.

82.     Broomfield could have also responded to complaints by explaining that the Operator Agreement was a binding contract on which Extraction had justifiably relied on to the tune of hundreds of millions of dollars, so residents near Well Sites would have to live with the temporarily inconvenience of this reasonable and necessary operational noise for a few months, until each Well Site was completed and quietly producing to pipelines – just like they might have to endure other  temporary noisy events such as nearby residential or commercial development construction, some of which are currently underway nearby these very same neighborhoods.

83.     Instead, the Broomfield City Council chose noise complaints as the basis for accomplishing its admitted goal of shutting down Extraction.

84.     In January 2020 the Broomfield City Council adopted "Emergency Ordinance No. 2117, Restrictions on Noise in Residential Areas."  **Exhibit 5**.  The Noise Ordinance defines oil and gas operations as an "industrial use"; and provides that any

industrial use operating outside of an existing industrial zoned area, *which is not in an enclosed building with a roof*, may not operate at night (between 10:00 p.m. and 7:00 a.m.) unless and until it submits a noise modeling study showing that its night operations will not exceed 40 dBA when measured at the boundary of the nearest adjacent residentially-zoned district; and also submits five nights of actual noise data confirming that the industrial use has not exceeded the 40 dBA limit at the specified location.  *Id.* That is, the Noise Ordinance effectively requires Extraction – and <u>only</u> Extraction (as the only industrial operation in Broomfield outside an industrial zoned area *without a roof*) – to operate at 40 dBA or less at night.

85.    Forty dBA is not two-thirds as loud as 65 dBA.  The decibel scale is logarithmic.  Each drop of 3 dB represents a halving of sound pressure.  The Ordinance's 40 dBA limit is less than one-half of 1% of the agreed-upon 65 dBA limit for Livingston. The federal Centers for Disease Control provide some useful references for decibel levels: 30 dBA is a soft whisper; 40 dBA is a refrigerator's hum.[4]  No oil and gas development can comply with this 40 dBA operational noise limit, which is precisely why Broomfield adopted it – to shut Extraction down, as it had promised residents it would do.

86.    The text of the emergency resolution and statements at the January 2020 City Council meeting confirms that the Ordinance was written just for Extraction. **Exhibit 5**, resolution discussing Extraction's Operator Agreement in the preamble.

87.    The targeting is further evidenced by the Ordinance's absurd provision

---

[4] https://www.cdc.gov/nceh/hearing_loss/what_noises_cause_hearing_loss.html.  This government website and data are subject to judicial notice. *United States v. Garcia*, 855 F.3d 615, 621-22 (4th Cir. 2017).

applying it only to industrial operations *without roofs – i.e.* only Extraction.

88.     Broomfield's decision not to apply the 40 dBA night noise limit to any commercial operations also evidences the targeting: a noisy bar operating at night near a residential neighborhood could create just as much or more residential noise, but is exempt.

89.     No other industrial operation has submitted a noise study to comply with the Ordinance because it was not intended to apply to anyone else – only Extraction.

90.     Broomfield's pretext is further confirmed by the fact that the pre-existing average ambient noise level at the Livingston Well Site was 61 dBA, including noise spikes well over that 61 dBA average every time a semi-truck barrels down the Northwest Parkway which runs *between* the Livingston Well Site and the nearest Anthem residential subdivision.          *See*          Broomfield          map          at https://www.broomfield.org/DocumentCenter/View/29209/Extraction-Well-Distance. Yet no residents ever complained about this pre-existing and continuing traffic noise which has long been much higher than 40 dBA at night; and Broomfield has never shut down the Northwest Parkway at night to protect nearby residents from traffic noise.[5]

91.     The Noise Ordinance was "unquestionably conceived, cut, [and] tailored" to shut down Extraction's operations.  *In re Senate Bill No. 95*, 361 P.2d 350, 354 (Colo. 1961) (legislation that is "unquestionably conceived, cut, [and] tailored" for a particular situation violates the Colorado Constitution's Article V § 25 prohibition on special

---

[5] The Northwest Parkway is a privately-owned toll road business of an industrial character, without a roof.  http://www.northwestparkway.org/about-us.html.  But again, needless to say, Broomfield has not cited or prosecuted the Northwest Parkway for violating the Noise Ordinance, or shut down the Parkway at night.

legislation).  The Noise Ordinance also violates federal "class of one" equal protection principles for this reason.

92.     Extraction did not submit a noise study or data per the Emergency Noise Ordinance because the Ordinance does not apply to Extraction for several reasons. Extraction's operations are not subject to the Ordinance because they are authorized by a contract (the 2017 Operator Agreement) rather than a USR permit.  **Exhibit 5**.  The Ordinance is not a valid "Future Regulation" under paragraph 15 of the 2017 Operator Agreement because it is not general in nature and applicable to all commercial as well as all industrial operations.  Also, the 2017 Operator Agreement prohibits Broomfield from prosecuting Extraction under the noise or nuisance chapters of the Broomfield Municipal Code for any conduct that is addressed by the 2017 Operator Agreement, like operational noise.  **Exhibit 2**, Operator Agreement ¶¶ 15, 27, and BMP 31.

93.     As soon as the Emergency Noise Ordinance took effect, Broomfield began issuing criminal citations to Extraction for operating at night without having previously submitted the required noise study and data.  *See Broomfield v. Extraction*, Municipal Court case nos. 20M800107, 20M800108, 20M800109, 20M800120, 20M800153, 20M800169, 20M800187, 20M800188, and 20M800189.  **Exhibit 6**, citations.  Each prosecution constitutes a breach of 2017 Operator Agreement ¶ 27.

94.     Broomfield has not prosecuted any other industrial or commercial operation under the Noise Ordinance – only Extraction.

95.     When Extraction pointed out the profound and fatal defects of the Emergency Noise Ordinance by moving to dismiss the prosecutions in Broomfield Municipal Court, Broomfield began issuing citations for alleged violations of a different provision of its noise code, and a provision of its nuisance code.  *See id*.  The prosecutions

invoking other provisions of the noise and nuisance chapters of the Broomfield Municipal Code similarly constitute breaches of 2017 Operator Agreement ¶ 27.

96.     After serving its first criminal citation to Extraction, Broomfield filed an unusual "Motion Requesting an Order Requiring Immediate Compliance" with the Emergency Noise Ordinance in Municipal Court case no. 20M800107.  **Exhibit 7**. Through this motion, Broomfield hoped to obtain a judge's approval and imprimatur before taking any enforcement steps beyond issuing citations, like sending police cars out to Well Sites to compel a shutdown.  Broomfield's decision to file such an unusual motion here further evidences its appreciation of how its enactment of a tailored noise ordinance, its prosecution of Extraction under this and similar nuisance ordinances, and any attempt to shut down Extraction's operations this way, are illegal and unconstitutional – Broomfield sought a judge's imprimatur as a supposed means of cloaking itself with qualified immunity.  However, Broomfield's efforts to engineer and confer qualified immunity upon itself this way only serve to prove the opposite: that Broomfield is not acting in good faith (a core requirement for qualified immunity), but knows it is illegally and unconstitutionally attempting to target Extraction and deprive Extraction of its vested property rights.

97.     At the first hearing on the Noise Ordinance violations, the presiding municipal court judge noted how Broomfield's motion for immediate compliance was strange, and denied it.

98.     Extraction filed a motion to dismiss the criminal prosecutions.  *See* **Exhibits 8-10**, Extraction's motion to dismiss, reply, and supplemental motion to dismiss filed in Broomfield Municipal Court.

99.     These motions sought dismissal based on numerous legal bases, including:

**Contract-based reasons for dismissal:**

- **2017 Operator Agreement BMP 31.** The Noise Ordinance does not apply to Extraction because BMP 31's noise mitigation regime of ambient plus 4 dBA (*e.g.* 65 dBA at the Livingston well site) is the party's expressly agreed-upon and therefore applicable noise limit.

- **2017 Operator Agreement paragraph 27.** Broomfield and Extraction expressly agreed that any prosecution of Extraction for conduct related to the 2017 Operator Agreement would be under the oil and gas chapter of its municipal code, not the noise or nuisance chapters.

- **2017 Operator Agreement paragraph 15.** This provision permits Broomfield to enact future regulations that apply to Extraction's oil and gas development activities so long as those future regulations are "general in nature" and "applicable to <u>all</u> commercial <u>and</u> industrial operations in the City." The Noise Ordinance applies only to certain industrial operations, and no commercial operations; and it is plainly not general in nature, as illustrated by the fact that it applies only to industrial operations *without roofs*.

**Constitutional bases for dismissal:**

- Extraction's justifiable reliance on the 2017 Operator Agreement creates vested property and contract rights which Broomfield may not impair with subsequent legislation under state and federal law.

- The Emergency Noise Ordinance targets Extraction in violation of Colorado's constitutional prohibition on special legislation; and the similar federal "class of one" equal protection principles.

- The vested nature of Extraction's rights was determined in the prior *Sovereign*

action, and cannot be challenged now per the law of issue preclusion.

- The Ordinance fails even a deferential rational basis review because it is not reasonable and proportional: the 40 dBA limit is less than one-half of 1% of the agreed-upon 65-dBA limit at the Livingston well site.

See **Exhibits 8-10**, dismissal briefing, developing these (and other) arguments in detail, with additional authority.  Additionally, Broomfield's enactment and application of the Noise Ordinance to Extraction's vested property and contract rights violates the *ex post facto* clause.

100.    On April 1, 2020, the Broomfield Municipal Court issued a two-page order summarily denying Extraction's motion to dismiss in part, and not addressing it in part. **Exhibit 11**.

101.    Instead of addressing Extraction's constitutional arguments, the Order simply held that Broomfield had a legitimate interest in regulating noise, and that the Noise Ordinance was rationally related to that interest.  *Id.*  Extraction, however, asserted numerous **as-applied** constitutional challenges rather than a facial challenge to the Ordinance, rendering this general rational basis review analysis irrelevant.   The Municipal Court's order does not address Extraction's specific as-applied challenges based on vested rights, retroactivity, equal protection, or reasonableness and proportionality (40 dBA being less than 1% of the agreed-upon 65 dBA).

102.    The Municipal Court's April 1, 2020 order twice stated that it was not considering Extraction's constitutional arguments "at this time," **Exhibit 11**; so Extraction understood the order as denying Extraction's motion to dismiss in part, and reserving ruling on all of the constitutional arguments for a later date.  However, at the July 28, 2020 arraignment hearing, the Municipal Court clarified that it would not

<u>address these constitutional arguments at all</u>.  The Municipal Court stated that such arguments are for another court to consider.  **Exhibit 12**, 7/28/2020 hearing transcript at 4:6-10, 11:1-4, 11:12-15, 12:3-14:16.

103.   The one dismissal argument that the Order does address is the future regulation provision.  The Municipal Court accepted Broomfield's argument that its new Noise Ordinance complied with this requirement because even though it applied only to industrial operations, other *pre-existing* provisions in Broomfield's noise code apply to both commercial and industrial operations, so the noise code *as a whole* has some provisions that apply to both industrial and commercial operations.  This argument is specious because pre-existing regulations are not and cannot be not future regulations.

104.   Specifically, the noise chapter of Broomfield's Municipal Code currently has nine provisions, BMC 9-36-010 to 9-36-090.  **Exhibit 13**.  The first seven provisions were enacted in 1989, long before the 2017 Operator Agreement, and thus cannot be "future regulations" under the 2017 Operator Agreement.  The new Noise Ordinance, enacted in January 2020 per **Exhibit 5** and codified at BMC 9-36-080 and 090, is the only potential "future regulation."  Broomfield is prosecuting Extraction for allegedly violating BMC 9-36-080, for operating at night without having previously submitted a noise study and data showing that night operations will be below 40 dBA.  BMC 9-36-080 obviously does not satisfy the 2017 Operator Agreement's requirement that this "future regulation" be "general in nature" and applicable to "all <u>commercial and</u> industrial operations" in the City.

105.   Per its plain language, BMC 9-36-080 is not "generally applicable," and applies only to industrial operations (and only those without roofs), and not to commercial operations at all.  Broomfield's argument, that the Noise Ordinance is a valid

74751735.3

"future regulation" because *other pre-existing* provisions of the noise code (BMC 9-36-010 to 070, enacted in 1989) apply to industrial operations, merits the strong term "specious." Yet the Broomfield Municipal Court accepted this argument. **Exhibit 11** at 2.

106.    The Broomfield Municipal Court's order has no preclusive effect. *Rantz v. Kaufman*, 109 P.3d 132, 141 (Colo. 2005) (Colorado court judgments do not obtain issue-preclusive effect until they become final, and are affirmed if appealed); *Salida School Dist. R-32-J v. Morrison*, 732 P.2d 1160, 1164-65 (Colo. 1987) (issue preclusion does not apply where the "procedures available in the first court may have been tailored to the prompt, inexpensive determination of small claims and thus may be wholly inappropriate to the determination of the same issues when presented in the context of a much larger claim", adopting Restatement (Second) of Judgments § 28(3) and comment d).

107.    On July 28, 2020, the Broomfield Municipal Court held an arraignment hearing.  Extraction pled not guilty.  The Municipal Court then set the first trial for September 21, 2020 – over Extraction's objections that it cannot possibly prepare to try a case worth as much as $400 million in eight weeks.  **Exhibit 12**, transcript of 7/28/2020 municipal court hearing at 20:8-22:22.  Additionally, Broomfield has not issued any noise citations since February 2020, and Extraction is not currently planning to start drilling or completions work on any of the remaining Well Sites for the remainder of 2020.  There is no reason to hurry these Municipal Court trials.

108.    The Broomfield Municipal Court nonetheless confirmed at the July 28 2020 arraignment hearing that it intended to try these prosecutions, worth hundreds of millions of dollars (if they result in shutdowns, as Extraction expects once Broomfield obtains its first conviction) like any ordinary municipal court matter.

**Exhibit 12**, 7/28/2020 transcript at 13:21-24 (Municipal Court's ruling that Extraction's constitutional defenses to Broomfield's prosecutions are not its concern but are for some "different Court" to deal with, because "This is a Municipal Court.  We need to keep that in mind.  And we're dealing with municipal ordinance violations.").  *See also id*. at 4:6-10, 11:1-4, 11:12-15, 12:3-14:16 (Extraction's legal defenses are for some other court to consider).

109.    Trial on the six Noise Ordinance violations is set to begin September 21, 2020.  A second trial on the two other noise and nuisance citations is set to begin October 5, 2020.

110.    At this point, two of Extractions six Well Sites in Broomfield are quietly producing oil and gas to the pipeline system built solely to support the Broomfield Project, but there are about 54 wells pending development at the remaining four Well Sites in Broomfield that must go through similar drilling and completion operations, and which may be subject to Noise Ordinance citations and physical shutdown by Broomfield.

111.    Extraction estimates that the present value of the oil and gas to be produced from these other wells is worth over $150 million.

112.    It is not economically feasible for Extraction to develop these assets if it has to shut down operations for nine hours every night, per Broomfield's special Noise Ordinance.  In addition to losing those nine nighttime hours of operation, Extraction would have to spend about four hours ramping down its operations before the 10:00 pm shutdown; and would spend another four hours ramping operations back up after 7:00 am.  Extraction cannot conduct an economically viable operation this way.  That is, of course, Broomfield's admitted intent and goal: to shut down Extraction's operations.

## FIRST CLAIM FOR RELIEF
### *Declaratory Judgment – Vested Rights*

113.    Extraction incorporates all prior paragraphs by reference.

114.    Extraction's rights to develop oil and gas in Broomfield according to the terms of the 2017 Operator Agreement (and the associated Surface Use Agreement, which incorporates the 2017 Operator Agreement) are vested rights that cannot be impaired by Broomfield under state and federal law.  *See* Colorado Constitution Article II Section 11; *P–W Investments, Inc. v. City of Westminster*, 655 P.2d 1365, 1371 (Colo. 1982); *City of Golden v. Parker*, 138 P.3d 285 (Colo. 2006); *Eason v Board of County Com'rs of County of Boulder*, 70 P.3d 600 (Colo.App. 2003); U.S. Constitution Article I Section 10*; United States Trust Co. v. New Jersey*, 431 U.S. 1, 22 (1977).

115.     The vested nature of Extraction's rights has already been determined in the *Sovereign* action.  **Exhibit 1**.  That legal determination applies here through principles of issue preclusion.  *Foster v. Plock*, 2017 CO 39, ¶ 13, 394 P.3d 1119, 1123.  And even without issue preclusion, this Court's analysis in the *Sovereign* order is legally correct and applicable here.

116.    To the extent that any rights in the 2017 Operator Agreement are not covered by the *Sovereign* Order, Extraction requests that the Court determine that such rights are vested per the same analysis and authority (justifiable reliance), based on the millions of dollars invested in land rights and construction of infrastructure to implement the required BMPs.

117.    Extraction requests a declaratory judgment that its rights under the 2017 Operator Agreement are vested rights, and that Broomfield therefore may not impair these vested rights through subsequently adopted legislation.

## SECOND CLAIM FOR RELIEF
### *Breach of Contract (Operator Agreement ¶ 15)*

118.   Extraction incorporates all prior paragraphs by reference.

119.   Paragraph 15 of the 2017 Operator Agreement permits Broomfield to enact future regulations, but only if such regulations are "general in nature" and "applicable to all commercial and industrial operations in the City."

120.   As set forth above, Broomfield's Emergency Noise Ordinance purports to be enacted under paragraph 15 of the 2017 Operator Agreement, but it is not generally applicable, excludes any commercial operations, excludes most other industrial operations, and specifically targets Extraction.  It is designed to give Broomfield an ostensible legal basis to shut down Extraction's night operations.

121.   Broomfield's enactment of a Noise Ordinance targeted at Extraction's operations, and its attempts to enforce that Ordinance against Extraction, are breaches of paragraph 15 of the 2017 Operator Agreement which have caused Extraction damages in an amount that Extraction will prove at trial.

122.   Extraction is also entitled to appropriate injunctive relief, such as an injunction prohibiting further prosecutions under the Noise Ordinance, and (to the extent permissible by the *Rooker/Feldman* doctrine) enjoining Broomfield's current prosecutions.

## THIRD CLAIM FOR RELIEF
### *Breach of Contract (Operator Agreement ¶ 27)*

123.   Extraction incorporates all prior paragraphs by reference.

124.   Noise from Extraction's operations is addressed by the 2017 Operator Agreement.

125.    Paragraph 27 of the 2017 Operator Agreement states that Broomfield may enforce violations of the 2017 Operator Agreement under the oil and gas chapter of its Municipal Code.

126.    Broomfield is currently prosecuting Extraction for alleged violations of the noise and nuisance chapters of the Broomfield Municipal Code based on noise levels at the Livingston Well Site.  *See* Broomfield Municipal Court matter numbers: 20M800107, 20M800108, 20M800109, 20M800120, 20M800153, 20M800169, 20M800187, 20M800188, and 20M800189; **Exhibit 6** (citations).  The citations in these criminal actions charge violations of B.M.C. §§ 9-36-020 and 9-36-070, which are provisions in the noise chapter of the Broomfield Municipal Code; and also violations of B.M.C. § 8-16-010, which is a provision in the nuisance chapter of the Code.

127.    Each of these prosecutions constitutes a breach of paragraph 27 of the 2017 Operator Agreement.

128.    Extraction's damages for these breaches include, but are not necessarily limited to, all of its attorney fees incurred in defending against these prosecutions; and any fines that the Municipal Court might issue.

### FOURTH CLAIM FOR RELIEF
### *Breach of Contract (implied covenant of good faith and fair dealing)*

129.    Extraction incorporates all prior paragraphs by reference.

130.    The 2017 Operator Agreement is a contract between Extraction and Broomfield.

131.    Under well-settled Colorado law, all contracts contain an implied covenant of good faith and fair dealing.  *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).

132. Good faith means, *inter alia*, acting in a reasonable manner, and not trying to thwart the other contracting party's reasonable expectations. Specifically, Colorado courts have held that "each party to a contract has a justified expectation that the other will act in a reasonable manner in its performance," *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo.App. 1994); and that "good faith performance of a contract involves faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Miller v. Bank of New York Mellon*, 2016 COA 95 ¶ 40, 379 P.3d 342, 348 (cleaned up). *Accord Ervin*, 908 P.2d at 498 ("The good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations.")

133. Broomfield's admitted goal of finding some basis for declaring Extraction to be in breach of the 2017 Operator Agreement so it can shut down the Project constitutes a breach of the covenant of good faith and fair dealing.

134. Broomfield's bad faith conduct is amply evidenced by its numerous efforts to "penetrate" the 2017 Operator Agreement (*i.e.*, to find some ostensibly legal basis to shut down Extraction's operations), including the proposed COVID-19 shutdown, and the current Noise Ordinance and prosecutions.

135. <u>Breach of contract.</u> Broomfield's breach of the implied covenant of good faith and fair dealing is a breach of the 2017 Operator Agreement that has caused Extraction damages in an amount that Extraction will prove at trial.

136. <u>Injunction against further bad faith or pretextual conduct.</u> Extraction is also entitled to and requests an injunction enjoining Broomfield from further bad faith or pretextual efforts to shut down or otherwise impair Extraction's operations, and requiring Broomfield to perform the 2017 Operator Agreement in good faith.

74751735.3

137.   Preclearance.   Extraction also asks the Court to enjoin Broomfield, including all of its organs and officials (the City Council, City Manager, Mayor, the Board of Health, etc.) from enacting any law or taking any action that would shut down, or otherwise impair or thwart Extraction's operations under the 2017 Operator Agreement without first obtaining this Court's approval for such law or action.

138.   While such equitable relief might seem extraordinary, it is grounded on sound equitable principles and is entirely appropriate under the circumstances, as evidenced by Broomfield's admitted and demonstrated intent to shut down Extraction's operations through any means necessary, including illegal, pretextual and bad faith conduct.

## FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983

139.   Extraction incorporates all prior paragraphs by reference.

140.   Broomfield has authority as a city and county to enact reasonable regulations to protect the health, safety and welfare of its residents.  But such regulations must be reasonably calculated to alleviate the harm at issue, be fairly and neutrally applied, and comport with constitutional and statutory law prohibiting cities and counties from impairing contracts or vested rights, and principles of equal protection.

141.   Broomfield's efforts to shut down Extraction's operations violate the U.S. Constitution Article I, section 10 prohibition on impairment of contracts.

142.   Broomfield's efforts to shut down Extraction's operations, in particular through the enactment of the targeted Emergency Noise Ordinance, violate the Fourteenth Amendment's equal protection guarantees under class-of-one principles.

74751735.3

143.    Since the Ordinance imposes a criminal penalties, Broomfield's enactment and application of the Noise Ordinance to Extraction's vested property and contract rights also violates the *ex post facto* clause.

144.     Extraction is entitled to damages from Broomfield pursuant to 42 U.S.C. § 1983, including actual damages, punitive damages, and fees.

145.    Extraction is also entitled to appropriate injunctive relief under 42 U.S.C. § 1983 to enjoin further violations of Extraction's constitutional rights, including but not limited to a preclearance injunction enjoining Broomfield and its officials and other organs of government (such as the City Council acting in its capacity as the Board of Health) from enacting any law or taking any action that would shut down, or otherwise impair or thwart Extraction's operations under the 2017 Operator Agreement without first obtaining this Court's approval for such law or action.

## SIXTH CLAIM FOR RELIEF
### *Declaratory Judgment, damages and injunction for state constitutional violations)*

146.    Extraction incorporates all prior paragraphs by reference.

147.    In addition to violating the federal constitution, Broomfield's conduct violates Colorado Constitution Article II section 11's prohibition against impairment of contracts and retrospective legislation; and Article V section 25's prohibition against special legislation.

148.    Extraction requests such damages as may be available and also injunctive relief discussed above based on these state constitutional violations.

## SEVENTH CLAIM FOR RELIEF
### *Regulatory taking under State and Federal Constitutions*

149.    Extraction incorporates all prior paragraphs by reference.

150.    Broomfield may not use its police powers to unilaterally impose noise limits or any other regulation that contradict the terms of the 2017 Operator Agreement and thereby nullify Extraction's vested property rights.  *See Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 439 (1934) (a local government's "reserved [police] power cannot be construed so as to … permit [it] to adopt as its policy the repudiation of debts or the destruction of contracts.").

151.    If this Court nonetheless determines that Broomfield's police powers provide proper authority for the Noise Ordinance, and if Broomfield uses that power to shut down or otherwise impair Extraction's operations, then Broomfield will have effected a regulatory taking for which it must pay just compensation under Colorado and federal law.  *See First English Evangelical Lutheran Church of Glendale v. Los Angeles*, 482 U.S. 304, 314-15 and 321 (1987) (the Fifth Amendment does not necessary prohibit local governments from properly using their police powers in a manner that interferes with property rights; it rather requires governments to pay just compensation when they do so).

152.    Extraction therefore requests a declaratory judgment that any shutdown or impairment of Extraction's operations by Broomfield through its Noise Ordinance, or other similar exercise of its police powers, constitutes a regulatory taking for which Broomfield must pay just compensation.

153.    Extraction requests that the Court order Broomfield to post a bond sufficient to cover the amount of any potential just compensation award before taking action to shut down or impair Extraction's operations; and enjoin Broomfield from such shut down or impairment until the Court approves the bond.

74751735.3

154.    In the event Broomfield succeeds in shutting down or impairing Extraction's operations, Extraction asserts an action for regulatory taking and just compensation to be determined by this Court in this action.

## PRAYER FOR RELIEF

WHEREFORE, Extraction requests:

- A money judgment for damages on its breach of contract, Section 1983 and other claims for damages;

- Declarations from the Court pursuant to its declaratory judgment claims;

- Temporary and permanent injunctions per its claims for equitable relief, including an injunction enjoining Broomfield from any further bad faith or pretextual conduct, and requiring Broomfield to obtain prior approval from the Court before enacting any law or taking any action that would shut down or otherwise impair or thwart Extraction's operations under the 2017 Operator Agreement;

- All other damages, costs, interest, penalties, fees and other relief that may be available and warranted by law or equity.

DATED this 14th day of September, 2020.

Respectfully submitted,

s/ *Ghislaine G. Torres Bruner*

Ghislaine G. Torres Bruner, #47619
Colin C. Deihl, #19737
Bennett L. Cohen, #26511
Isuri Lawson, #52632

POLSINELLI PC
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Phone: (303) 572-9300
Email: gbruner@polsinelli.com
*Attorneys for Plaintiff Extraction Oil &*
*Gas, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The Verified Complaint shall be served pursuant to F.R.C.P. 4. The below certification of service is for future use in ordinary pleadings.

I hereby certify that on this 14th day of September, 2020, I served a true and correct copy of the foregoing via CM/ECF, which will send electronic notification to all parties and their counsel.

<u>*s/ Bennett L. Cohen*</u>
Bennett L. Cohen

74751735.3

## VERIFICATION

I, Eric J. Christ, the Vice President and General Counsel of the Plaintiff Extraction Oil & Gas, Inc., have read this Complaint and I affirm that factual statements are true to the best of my knowledge.  I make this verification subject to penalties for perjury.


September 14, 2020
_____
Date

_____
Eric J. Christ

74751735.3